**PORT DISTRIBUTING CORP., Plaintiff,**

v.

**William PFLAUMER, Defendant.**

**No. 92 Civ. 5514 (LAP).**

United States District Court, S.D. New York.

March 21, 1995.

Roy A. McKenzie, New York City, for plaintiff.

Gregg J. Borri, New York City, Alan Klein, Mark J. Rosen, Cohen, Shapiro, Pol-

isher, Shiekman and Cohen, Philadelphia, PA, for defendant.

### MEMORANDUM AND ORDER

PRESKA, District Judge.

Plaintiff, Port Distributing Corp. ("Port"), brought this action to compel payment of $560,000.00, together with 19% interest from October 1, 1991 based upon a guaranty executed by the defendant, William Pflaumer ("Pflaumer"). Port has moved for summary judgment. Defendant opposes this motion and has cross-moved for summary judgment, arguing that Port impaired the collateral that secured the guaranteed obligation, thereby discharging the guarantor. Upon reviewing the record and the parties' submissions, I find defendant's arguments persuasive and conclude that Port's actions, in fact, have discharged Pflaumer. Plaintiff's motion for summary judgment, therefore, is denied; defendant's cross-motion is granted.

### BACKGROUND

Port, a New York corporation, is a wholesale beer distributor. As of October 3, 1989, Port possessed certain distribution rights in the distribution of malt beverages made by the G. Heileman Brewing Co., Inc. ("Heileman") in the New York metropolitan area. It had acquired these rights pursuant to an earlier agreement with Heileman. On October 3, 1989, Port entered into a Purchase and Sale Agreement with Heileman essentially to sell back these distribution rights. The price of the distribution rights was $500,000.00.[1]

The Purchase and Sale Agreement directed that the $500,000.00 purchase price be paid as follows:

(a) On the Closing Date, Purchaser shall deliver the following ...:

(ii)(A) a non-interest bearing promissory note to the order of Seller in the aggregate amount of $500,000.00 in the form set forth in Exhibit A representing the Purchase Price in respect of the Distribution Rights and (B) a non-interest bearing note to the order of H. Dieter Holterbosch in the aggregate amount of $200,000.00 in the form set forth in Exhibit B representing the amounts due in respect of the Non–Com-

pete Agreement (collectively the "Deferred Payment Notes").

(Affidavit of Gregg J. Borri in Opposition to Plaintiff's Motion for Summary Judgment ("Borri Aff."), Exh. A.)

On October 3, 1989, Heileman duly signed two non-interest-bearing promissory notes in accordance with this provision. The first, in the amount of $500,000.00, carries on its face the following guaranty:

The undersigned, William P. Pflaumer, individually, and Midway Beverage Corp., jointly and severally, hereby unconditionally and irrevocably guarantee the obligations of G. Heileman Brewing Co., Inc. under this Note.

(Borri Aff., Exh. A.) The second promissory note in the amount of $200,000.00 carries an identical guaranty. (Id.)

Contemporaneously with the Purchase and Sale Agreement and the Notes, Port and Heileman executed a Security Agreement, under which Heileman granted Port a first priority security interest in the distribution rights that Heileman was acquiring. This interest secured Heileman's obligations under the Deferred Payment Notes.

On November 2, 1989, Holterbosch and Port filed a UCC–1 financing statement with the City Register—Kings County, claiming a security interest in "All of Debtor's right, title and interest in and to the Assets and Distribution Rights described in the Purchase and Sale Agreement dated October 3, 1989 among Debtor and Secured Parties." On November 13, 1989, Port and Holterbosch filed a substantially identical UCC–1 with the Nassau County Clerk.

Approximately fourteen months later, on January 24, 1991, Heileman petitioned for protection under Chapter 11 of the Bankruptcy Code. On January 28, 1991, the United States Trustee's Office sent a letter to all of Heileman's known creditors, including Port and Pflaumer, advising of the formation of a creditors' committee. Port filed proofs

---

**1.** Within the same agreement, Port and Dieter H. Holterbosch ("Holterbosch"), Port's sole shareholder, agreed to deliver a Non–Compete Agreement and a Consulting Agreement. The transfer of these Agreements was in exchange for an additional $500,000.00 ($250,000.00 per Agreement).

of claim in the amount of $500,000.00; Holterbosch filed a proof of claim in the amount of $60,000.00 [2] Both documents alleged that the claims were "secured," "priority" claims. Pflaumer evidently did not file a proof of claim in the Bankruptcy proceeding.

On or about October 1, 1991, the attorneys for Heileman sent Port notice of a security agreement between Heileman and First National Bank of Boston ("First National") dated June 30, 1988. Counsel claimed that this security agreement constituted a pre-existing lien covering the distribution rights. Thereafter, because of First National's priority, Port and Holterbosch stipulated to a reduction in their claims and treatment as unsecured creditors in the bankruptcy proceedings. These stipulations were "So Ordered" by the Bankruptcy Court on June 22, 1991. Lacking recourse against the collateral, Port then filed this action, pursuing its claim against Pflaumer as guarantor.

### DISCUSSION

Under Rule 56(c), summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The substantive law determines which facts are material to the outcome of a particular litigation. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511; *Heyman v. Commerce & Indus. Ins. Co.*, 524

F.2d 1317, 1320 (2d Cir.1975). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Only when it is apparent, however, that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight" should summary judgment be granted. *Gallo v. Prudential Residential Services, Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir. 1994).

The plaintiff in this case would have me first look solely at the promissory notes and accompanying guarantees, and then enforce Port's claim against Pflaumer in accordance with those documents' evident terms. The plaintiff points to the parol evidence rule as the rationale for this position. Although plaintiff's position would simplify the case significantly, the argument fails for two reasons.

First, the parol evidence rule does not bar evidence of contemporaneous written agreements. Under N.Y.U.C.C. § 2–202,[3] the terms of a written agreement may not be contradicted by a prior written agreement or by prior or contemporaneous oral agreement. The Security Agreement concerning Port's security interest in the distribution rights was executed at the same time as the Pur-

---

**2.** Heileman paid $140,000.00 of the $200,000.00 note.

**3.** As will be discussed in greater detail below, the U.C.C. applies to this case because the hybrid documents, consisting of the promissory notes with annexed guarantees, are negotiable instruments under Article 3 of the U.C.C. Further, as will be shown, the U.C.C. does not differ materially from common law principles of equity which would apply in the absence of a relevant Code provision.

chase and Sale Agreement, the promissory notes and the guarantees. All of these documents, therefore, properly are before the Court in determining the enforceability of the guaranty.

■ Second, with reference to the particular context of this transaction, a principal contract and a guaranty are considered as one for the purposes of interpretation where the guaranty is made at the time the principal contract is executed.[4] *See Components Direct Inc. v. European American Bank*, 175 A.D.2d 227, 572 N.Y.S.2d 359, 361 (2nd Dep't 1991). This interpretive principle is well-settled; as long ago as 1912, the New York Court of Appeals held that, where a guaranty was made at the same time a contract of sale was entered into, the instruments would be construed together. *See Catskill National Bank v. Dumary*, 206 N.Y. 550, 100 N.E. 422 (1912); *accord Hirsch v. Rifkin*, 166 A.D.2d 293, 564 N.Y.S.2d 120 (1st Dep't 1990) (holding that three contemporaneously executed instruments, including a guaranty, must be viewed as interdependent).

In accordance with this long-standing rule, I must look at the parties' entire transaction, as embodied in the Purchase and Sale Agreement, the Security Agreement, and the Notes with their guarantees. Clearly, the reality of this transaction was a sale for consideration in the form of a promise to pay: Port attempted to protect its rights to collect on this promise first by acquiring a security interest in the distribution rights and then by obtaining Pflaumer's guaranty. The parties' obvious intent was that, upon Heileman's default, Port's first recourse would be to the collateral. To the extent the collateral proved inadequate to cover the obligation,

Port then could look to Pflaumer to satisfy the shortfall.

■ It is a venerable principle in New York law that a creditor holding collateral security for an obligation that is guaranteed holds that collateral in trust for the guarantor, and must preserve it for the benefit of the guarantor. *See The Merchant's Bank of Syracuse v. Comstock*, 55 N.Y. 24 (1873). The reason for this rule is apparent—creditors may not shift unjustly the burden of a debt upon a guarantor. As one authority has observed:

> A surety has an interest in any property transferred by the debtor of the creditor to secure a debt for which the surety is liable. A guarantor or a surety has the right to expect that the terms upon which the guaranty or suretyship contract was made will remain unchanged, including terms relating to collateral security furnished by the debtor or obligor. Where collateral securities are held by the creditor for the debt, he holds them in trust for the surety, who is entitled to their benefit, and to have them applied in extinguishment pro tanto of his liability. Since a surety has a right of substitution or subrogation in the event that he pays the debt, and can then compel the creditor to assign to him collateral security held for the debt for his indemnity, *a creditor has no right to release or discharge such securities, and to throw upon the surety the burden of the debt which might otherwise have been paid in whole or in part out of the principal, or primary, obligor . . . .*

63 N.Y.Jur.2d, *Guaranty and Suretyship* § 242 (1987) (emphasis added).

■ A creditor who releases (rather than merely impairs) collateral without the con-

---

4. Plaintiff's reliance on *Walther v. Bank of New York*, 772 F.Supp. 754 (S.D.N.Y.1991), is misplaced. In *Walther*, the court would not permit a guarantor to introduce parol evidence regarding a third party's promise to contradict directly the express language in the contract between the creditor and the guarantor. The case concerned the application of proceeds of the sale of collateral to satisfy an obligation before recourse to the guarantor. Based on language in the guaranty which stated that the guaranty would be operable "irrespective of the genuineness, validity, regularity or enforceability" of any collateral and

which further provided that "the Bank shall be under no obligation to . . . resort to any collateral . . . as a condition precedent" to the guarantor's obligations, the court refused to impose a requirement that collateral be applied to the guaranteed obligation before another. *Id.* at 760. Moreover, the contradictory agreement was not executed contemporaneously with the guaranty. *Id.* at 756. In the present case, the documents comprising the entire transaction were executed at the same time, and there was no such express language releasing the creditor from any obligations with respect to the collateral.

sent of the guarantor discharges the guarantor from his or her obligations under the guarantee. *See id.* § 243; *see also Benderson Development Co., Inc. v. Schwab Bros. Trucking, Inc.,* 64 A.D.2d 447, 409 N.Y.S.2d 890 (4th Dep't 1978) (holding that a surety may be released from its obligation where the debtor and creditor enter into agreements impairing the collateral security). This equitable doctrine has found its way into the New York Uniform Commercial Code. U.C.C. § 3–606 provides, for example, in relevant part, that:

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder . . .

(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against who he has a right of recourse.

Article 3 of the Uniform Commercial Code, of course, applies only to negotiable instruments, and, ordinarily, a guaranty is not a negotiable instrument. *See Manufacturers and Traders Trust Co. v. International Packaging, Inc.,* 207 A.D.2d 982, 617 N.Y.S.2d 91 (4th Dep't 1994). In the present case, however, the guaranty actually is annexed to, and made part of, the promissory note, which itself undoubtedly is a negotiable instrument. Under such circumstances, the entire document is to be considered a negotiable instrument and the provisions of U.C.C. Article 3 apply with full force. *See, e.g., City National Bank v. Reiman,* 236 Ill.App.3d 1080, 175 Ill.Dec. 919, 601 N.E.2d 316 (1992); *Guarantor Partners v. Huff,* 830 S.W.2d 73 (Tenn.Ct.App.1992); *see also Higgins v. Hocking Valley Ry.,* 188 A.D. 684, 177 N.Y.S. 444, 452 (1st Dep't 1919) (holding that an endorsement on the face of a bond in no way detracted from the bond's negotiability).

In the present case, the security interest that Port obtained was a purchase money security interest. U.C.C. § 9–107 defines a purchase money security interest as one that is "taken or retained by the seller of the collateral to secure all or a part of its price." Here, Port sold the distribution rights and obtained a security interest to protect its receipt of full payment for those rights. A purchase money security interest is entitled to priority over a conflicting security interest in the same collateral as long as it is perfected at the time the debtor receives possession of the collateral or within twenty days thereafter. U.C.C. § 9–312(4). The Official Comment to subsection (4) notes that the perfection requirement is satisfied by the filing of a financing statement within twenty days. Moreover, enjoyment of the priority position is unaffected by the holder's knowledge of the conflicting interest or whether the conflicting interest was filed. Thus, if Port had filed its UCC–1 by October 23, 1989, Port would have been entitled to priority over First National. Port acknowledged as much in its Reply Memorandum of Law when it stated:

Port and Holterbosch's interests in the collateral, moreover, were worthless at the time of the alleged transfer [of the distribution rights] to Tri–County and Prospect [in the bankruptcy proceeding], because of the pre-existing lien of the First National Bank of Boston. Contrary to Pflaumer's assertion, the Port and Holterbosch liens were not purchase money security interests. The interests were created on October 3, 1989. *Even if they otherwise qualified as such, the security interests were not perfected until well after the ten [sic] day limit required by statute to perfect a purchase money security interest.*

(Plaintiff's Reply Memorandum of Law at 3 (emphasis·added).)

Ironically, Port is correct that its alleged assignments of the distribution rights and the stipulations into which it entered in connection with the bankruptcy proceeding could not have impaired the collateral it already had damaged irreparably by failing to file the financing statement in a timely manner. For Port to assert, however, that the defense of release of collateral thereby is barred, is like the defendant who has murdered her parents seeking mercy from the court because she is an orphan.

In *Executive Bank of Fort Lauderdale v. Tighe,* 66 A.D.2d 70, 411 N.Y.S.2d 939 (2d Dep't 1978), *modified on other grounds,* 54 N.Y.2d 330, 445 N.Y.S.2d 425, 429 N.E.2d 1054 (1981), a UCC–1 financing statement

was filed in the County Clerk's office rather than with the Secretary of State as required to perfect the security interest. The court held that the negligent filing in itself constituted an unjustifiable impairment of collateral and discharged the guarantor. Commenting on the *Tighe* case, the court in *Leslie Fay, Inc. v. Rich*, 478 F.Supp. 1109 (S.D.N.Y. 1979) noted that:

> As a general matter ... the rule in *Tighe* may represent the better view even in many commercial dealings outside the context of commercial paper. A guarantor may assume great risks, but he should be entitled to expect creditors to behave with at least a minimal degree of commercial reasonableness and care. In particular, where an independent third party guarantees an obligation as an accommodation to the debtor, *it seems reasonable for that party to rely on the expectation that a businessman-creditor will act responsibly and make at least a reasonable effort to secure its collateral under the U.C.C., thereby protecting the guarantor's subrogation interest. The Code's approach properly recognizes the importance of avoiding waste and minimizing damages.*

*Id.* at 1116 (emphasis added); *see also Mikanis Trading Corp. v. Block*, 59 A.D.2d 689, 398 N.Y.S.2d 679 (1st Dep't 1977) (holding that the defense of impairment of collateral was available to a guarantor where the plaintiff had failed to file the security agreement in the proper offices). Outside New York, courts generally have interpreted a creditor's failure to file a lien as sufficient impairment of a surety's right of subrogation to discharge the guarantor. *See, e.g., Ammerman v. Miller*, 488 F.2d 1285 (D.C.Cir.1973); *Langerveld v. L.R.Z.H. Corp.*, 74 N.J. 45, 376 A.2d 931 (1977); *Custom Leasing, Inc. v. Carlson Stapler & Shippers Supply, Inc.*, 195 Neb. 292, 237 N.W.2d 645 (1976); *National Bank of Detroit v. Alford*, 65 Mich.App. 634, 237 N.W.2d 592 (1975); *First Nat'l Bank v. Haugen Ford, Inc.*, 219 N.W.2d 847 (N.D. 1974); *Peoples Bank of Point Pleasant v. Pied Piper Retreat, Inc.*, 158 W.Va. 170, 209 S.E.2d 573 (1974); *Behlen Mfg. Co. v. First*

*Nat'l Bank of Englewood*, 28 Colo.App. 300, 472 P.2d 703 (1970); *D.W. Jaquays & Co. v. First Security Bank*, 101 Ariz. 301, 419 P.2d 85 (1966) (en banc).

Port acted manifestly unreasonably in its failure to perfect in a timely manner its security interest in the distribution rights. This failure was considerably more egregious than a mere failure to affirmatively pursue the collateral, which will not discharge the surety. *See Chemical Bank v. PIC Motors Corp.*, 87 A.D.2d 447, 452 N.Y.S.2d 41 (1st Dep't 1982), *aff'd*, 58 N.Y.S.2d 1023, 462 N.Y.S.2d 438, 448 N.E.2d 1349 (1983); *Chemical Bank v. Valentini*, 84 A.D.2d 801, 444 N.Y.S.2d 154 (2d Dep't 1981). Port's late filing had the effect of releasing its priority claim to the collateral. The bankruptcy stipulations into which it later entered simply confirmed that fact. In light of New York's long-standing allegiance to the equitable principle that a creditor's release of collateral discharges the guarantor, as well as the express provisions of U.C.C. § 3–606, Pflaumer was discharged as a result of Port's unreasonable action.[5]

It is also clear that Port's actions resulted in more than a mere impairment of collateral. Port released the collateral entirely, as evidenced by the fact that the company stipulated to the treatment of its claims as unsecured in the bankruptcy action. For this reason, Pflaumer's obligation under the guaranty is discharged entirely, rather than his obligation being extinguished *pro tanto*. In this case, the *pro tanto* reduction is in effect 100%.

I note that in *Mikanis Trading Corp. v. Lowenthal*, 94 Misc.2d 962, 406 N.Y.S.2d 220 (Sup.Ct.N.Y.County 1977), the court held that the defense of impairment of collateral was unavailable to a guarantor, because the guarantor was equally able to file the financing statement in order to safeguard his interests. *Mikanis* involved the failure of the President and sole shareholder of the debtor corporation to file a UCC–1—the guarantor intimately was involved in the secured trans-

---

5. Because Port released the collateral before the initiation of the Chapter 11 proceeding, I do not need to reach the question of the preclusive effect of the Bankruptcy Court "so ordering" Port's stipulations.

action. *Mikanis* must be confined to its facts or the critical distinction between a capability to file and a duty to do so will be obliterated completely. To hold in every case that a guarantor has the duty to file the financing statement, and that he or she loses the defense of impairment of collateral as a result of his or her failure to do so, would render the defense meaningless. Any creditor could excuse his failure to perfect the security interest in accordance with reasonable commercial expectations on the grounds that the guarantor had failed to take advantage of his own opportunity to file. Because this is an anomalous result in view of New York's long-standing equitable principles, as well as the provisions of U.C.C. § 3–606, I decline to abrogate the impairment defense on this basis. At least in circumstances where, as here, the guarantor is not a principal of the debtor, the better rule is that the guarantor is entitled to rely on the creditor to take commercially reasonable steps to protect the secured interest, including, at a minimum, the timely filing of a financing statement. The surety can invoke the defense of impairment of collateral when the creditor fails to meet this minimum standard.

 The final potential obstacle to a discharge of Pflaumer is the possibility that the "unconditional and irrevocable" language in the guaranty operates as a waiver of the defense of impairment of collateral.[6] In *Executive Bank of Fort Lauderdale v. Tighe*, 66 A.D.2d 70, 411 N.Y.S.2d 939 (2d Dep't 1978), *modified by*, 54 N.Y.2d 330, 445 N.Y.S.2d 425, 429 N.E.2d 1054 (1981), the Appellate Division held that, to be effective, a waiver of the duty to perfect a security interest had to be express. On appeal, the New York Court of Appeals held that the guarantor had waived the defense where "it [was] clear from the *express* wording of the endorsement that the Bank could have released the collateral at any time without notice to the [guarantors]. . . ." *Executive Bank of Fort Lauderdale v. Tighe*, 54 N.Y.2d 330, 445 N.Y.S.2d 425, 429, 429 N.E.2d 1054, 1058 (1981) (emphasis added). Thus, the Court of Appeals did not eliminate the requirement of an express waiver, but rather found that the con-

sent to impairment in that case was sufficiently explicit to be effective.

Similarly, in *European American Bank v. Kahn*, 175 A.D.2d 704, 573 N.Y.S.2d 274 (1st Dep't 1991), the court decided that a creditor's failure to perfect a security interest did not affect the guarantor's liability in light of specific provisions within the guaranty permitting the bank to reduce or release collateral. In *European American Bank v. Lofrese*, 182 A.D.2d 67, 586 N.Y.S.2d 816 (2d Dep't 1992), the obligation of a guarantor whose guaranty was "absolute and unconditional" was held not to have been discharged by virtue of the creditor's impairment of collateral. Crucial to the court's decision, however, was the fact that the defendant expressly guaranteed obligations "of whatsoever nature and however evidenced, *whether . . . secured or not secured.*" *Id.* at 820 (emphasis added); *see also Marine Midland Bank v. The Brunswick Group, Inc.*, No. 83 Civ. 7070 (JFK), 1985 WL 174 (S.D.N.Y. January 8, 1985) (holding that defendants' affirmative defenses failed as a consequence of the explicit waivers contained in the guarantees); *Chemical Bank v. PIC Motor Corp.*, 87 A.D.2d 447, 452 N.Y.S.2d 41 (1st Dep't 1982) (finding that the defense of impairment of collateral was inapplicable where according to the express terms of the guaranty the bank had the right to release the collateral).

 These cases support the conclusion that a waiver of the obligation to perfect the security interest must be express—the waiver must state specifically that it contemplates some release or reduction of the collateral or that the secured status of the debt is irrelevant to the guaranty. This rule is in accordance with the general principle that a waiver is the intentional relinquishment of a known right, which must be evidenced by a clear manifestation of intent. *See Internor Trade, Inc. v. Goldmark Plastic Compounds, Inc.*, 166 A.D.2d 211, 564 N.Y.S.2d 96 (1st Dep't 1990); *accord K. Bell & Assocs., Inc. v. Lloyd's Underwriters*, 827 F.Supp. 985 (S.D.N.Y.1993). A waiver also must be clear, unmistakable and without ambiguity. *See Civil Serv. Emp. Assoc. Inc., Local 1000 v.*

---

**6.** Supplemental briefing was submitted by the parties on this issue.

*Kinsella,* 194 A.D.2d 1054, 599 N.Y.S.2d 671 (3d Dep't 1993). If parties to a guaranty intend a waiver of defenses arising from the alteration of the underlying contract or impairment of the right of subrogation, they must include clear and unambiguous language to that effect. *See Banco Portugues do Atlantico v. Asland, S.A.,* 745 F.Supp. 962, 967–70 (S.D.N.Y.1990); *First American Bank of New York v. Builders Funding Corp.,* 200 A.D.2d 946, 607 N.Y.S.2d 460 (3d Dep't 1994); *BT Commercial Corp. v. Blum,* 175 A.D.2d 43, 572 N.Y.S.2d 10 (1st Dep't 1991); *American Bank & Trust Co. v. Koplik,* 87 A.D.2d 351, 451 N.Y.S.2d 426 (1st Dep't 1982).

■ Further, § 1–102 of the New York Uniform Commercial Code provides that the Act shall be construed to "make uniform the laws among the various jurisdictions." U.C.C. § 1–102(2)(c). The highest courts of other states consistently have held that the mere use of terms like "unconditional" and "irrevocable" does not constitute a waiver of the impairment of collateral defense as it applies to failure to perfect a security interest in a timely manner. In *Langeveld v. L.R.Z.H. Corp.,* 74 N.J. 45, 376 A.2d 931 (1977), for example, the New Jersey Supreme Court stated that the equitable right of subrogation "does not originate in contract and it cannot lightly be destroyed by contract." *Id.* 376 A.2d at 935. The court held that the "unconditional" language permitted the creditor to move against the guarantor without first proceeding against the principal debtor or the collateral, but that such language did not give a creditor the right to prevent, by misfeasance or nonfeasance, the guarantor from ever recovering against the collateral. *See id.* (citing *Behlen Mfg. Co. v. First National Bank of Englewood,* 28 Colo. App. 300, 472 P.2d 703 (1970); *First National Bank of Grand Forks v. Haugen Ford, Inc.,* 219 N.W.2d 847 (N.D.1974); *Custom Leasing, Inc. v. Carlson Stapler & Shippers* impairment defense when a creditor has failed to perfect its security interest).

The language in Pflaumer's guaranty clearly falls short of this standard. Pflaumer unconditionally guaranteed a *secured* obligation. The Security Agreement was executed contemporaneously with the guarantees,

and, as discussed above, must be construed as part of the same transaction. Pflaumer was entitled to rely on Port to take commercially reasonable steps to protect the secured position, including, at a very minimum, the timely filing of a UCC–1. It would require a significantly more explicit waiver than the language presented in this case to free Port from the performance of such a basic requirement—without such an express waiver, I am not willing to strap Pflaumer with an obligation that is wholly different from the obligation he originally guaranteed.

### CONCLUSION

I find that Port's failure to perfect its security interest in a timely manner constituted a complete release of the collateral, which was neither excused in any way, nor waived by Pflaumer. Port's failure to perfect timely the security interest operated to discharge defendant Pflaumer entirely. Accordingly, Port's motion for summary judgment is denied and Pflaumer's cross-motion for summary judgment is granted. Plaintiff's complaint, therefore, is dismissed.

SO ORDERED.