OPINION OF THE COURT
Kenneth R. Fisher, J.
The defendants in October 2002 were romantically involved and signed as cobuyers a retail installment contract for the purchase of a 2003 Chevrolet Silverado pick-up truck from O’Connor Chevrolet. Brenda Crowe alleges that she signed the contract because Bovee told her that he would not be able to purchase the truck due to his poor credit rating. The truck was registered in Bovee’s name and he was the title owner; no one suggests that she derived any benefit from the transaction. He took the truck to Florida shortly after the purchase. Although Crowe claims that she was never told that she would be responsible for payments if Bovee defaulted in his payments, the retail installment contract she signed clearly provides that she would be liable to make payments.
ESL notified Crowe in June 2003 that Bovee was behind in his payments. Crowe notified ESL that she was a waitress without means; could not afford to make any payments for the truck; and that she did not believe she was responsible for making payments merely by reason of cosigning the loan. ESL asked her for assistance in repossessing the vehicle. Crowe provided ESL with Bovee’s address in Cape Coral, Florida. Armed with that information, ESL repossessed the vehicle.
On August 29, 2003, ESL wrote Crowe, advising that they had repossessed the vehicle and that it would be sold at a private sale. The letter notified Crowe of her right of redemption upon payment of the outstanding balance due on the loan, and told her that she would be responsible “for the difference between the proceeds realized from the sale and the sum of the entire balance due on your obligation, plus the repossession expenses described above.” The sale was to take place on September 8, 2003. Thereafter, when Crowe contacted ESL to make sure that she was released from the loan, she was only told that ESL had released its lien on the truck, and had so notified the Department of Motor Vehicles (DMV). ESL gave Crowe a copy of the lien release covering the truck. ESL did not notify her that, in fact, Bovee brought his payments current and that ESL reinstated the loan, which it had previously “charged-off,” and *258 permitted Bovee to retain the truck free and clear of any encumbrances.
In January 2004, ESL wrote to Crowe with the news that Bovee was again behind in his payments and that she would be liable as a comaker on the note. Crowe protested, in a letter dated February 5, 2004, that she was not liable for the reinstated loan and that she had “no security interest pertaining to 2003 Chevy Silverado.” In a conversation with an ESL employee, Crowe said that she was under the impression that ESL had sold the vehicle at a private sale after she helped them to repossess it and that she expected to be released from any obligation under the loan. Thereafter, ESL’s attorney threatened collection activity and Crowe retained counsel, who was unsuccessful in forestalling a lawsuit.
ESL’s attorney acknowledged in a letter to Crowe’s counsel dated April 21, 2004 that “[t]he lien was released by an error on our part.” ESL also acknowledged that it, indeed, repossessed the vehicle and that it gave the car back to Bovee after he made up the back payments. ESL does not claim that it notified Crowe of any of these arrangements. Crowe now contends, armed with several credit agency reports, that ESL, in fact, “refinanced” the loan when it gave it back to Bovee without retaining any security interest in the truck.
Crowe also protests that she originally signed the agreement by virtue of a mistake of fact concerning whether she would be responsible for the loan in the event Bovee defaulted, that she is a waitress and cannot afford the payments, and that she has been wrongfully defamed by ESL by its reporting of negative credit information. In particular, Crowe disputes ESL’s contention in support of its motion for summary judgment that the “lien release is not relevant to the instant action.” Crowe maintains that ESL’s release of its title and interest in the subject vehicle creates a triable issue of fact. In addition, Crowe maintains that ESL allowed Bovee to transfer the vehicle to a third party free and clear of any liens, and that Bovee therefore was enabled to retain the proceeds of the transfer without any offset against any amount that may have been owed to ESL. Crowe further contends that Mr. Follaco of ESL must have been aware of the third-party sale because he subsequently informed Crowe that the car was sold in Florida to a Richard Peck.
Discussion
Crowe’s papers present a classic case of the surety’s defense of impairment or release of collateral. Both at common law *259 (Shutts v Fingar, 100 NY 539, 544 [1885]; Merchants’ Natl. Bank of Syracuse v Comstock, 55 NY 24 [1873]; Executive Bank of Fort Lauderdale, Fla. v Tighe, 66 AD2d 70, 74-75 [2d Dept 1978], mod on other grounds on appeal after remand 54 NY2d 330 [1981]; Benderson Dev. Co. v Schwab Bros. Trucking, 64 AD2d 447, 455 [4th Dept 1978]), and now by statute (UCC 3-606 [1] [b]), the creditor holds collateral security interests concerning a debt obligation in trust for the surety or guarantor and must preserve its interests therein for the latter’s benefit. (63 NY Jur 2d, Guaranty and Suretyship §§ 242-244; see also, L & B 57th St., Inc. v E.M. Blanchard, Inc., 143 F3d 88, 92 [2d Cir 1998] [“long-standing solicitude of New York law for the interests of guarantors”]; Port Distrib. Corp. v Pflaumer, 880 F Supp 204, 208-209 [SD NY 1995] [holding that, under New York law, a “creditor who releases (rather than merely impairs) collateral without the consent of the guarantor discharges the guarantor from his or her obligations under the guarantee”], affd 70 F3d 8 [2d Cir 1995] [per curiam].)[1] Failure to file a purchase money security interest “in itself constitute^] an unjustifiable impairment of collateral and discharge [s] the guarantor.” (Port Distrib. Corp. v Pflaumer, 880 F Supp at 209-210, citing Executive Bank of Fort Lauderdale, Fla. v Tighe, 66 AD2d at 76 [the common law and UCC 3-606 regard “the creditor’s failure to file a lien, as an impairment of the surety’s right of subrogation and, therefore, a pro tanto discharge of the surety”]; see Restatement [Third] of Suretyship and Guaranty § 42 [2] [a], [b] [1996].) So Crowe pleads a venerable suretyship defense which, on the facts, is more than viable. If this was all there is to the case, Crowe would easily raise an issue of fact precluding summary judgment, because there are decisions in this state and in others which, upon identical facts, would dis *260 charge an accommodation maker or surety. (E.g., Security Natl. Bank of Long Is. v Temarantz, 1969 WL 11045 [Sup Ct, Nassau County, Mar. 17, 1969] [but remanding for trial of whether defendant was indeed an accommodation maker]; Bank of N.J. v Pulini, 194 NJ Super 163, 166-167, 476 A2d 797, 798-799 [1984],)[2]
In reply, plaintiff does not in so many words plead waiver or consent to the release of ESL’s secured interest in the truck. The cases hold that an accommodation maker or surety or guarantor may consent in advance, or waive the impairment of collateral defense, typically in the instrument itself. (Executive Bank of Fort Lauderdale, Fla. v Tighe, 54 NY2d at 336-339; Indianapolis Morris Plan Corp. v Karlen, 28 NY2d 30, 35 [1971] [“no public policy protecting necessitous debtors to prevent this”]; UCC 3-606, Comment 2.) In its moving papers, plaintiff merely says that the eighth affirmative defense (“Plaintiff’s release of any interest it may have had in the subject vehicle bars this action”) is not supported “in law or logic” because the release of collateral is not a release of a contractual obligation “to repay the amount loaned.” (Barnash affirmation H 36.) While this might be held a failure to preserve the waiver or consent issue, plaintiff’s counsel’s reply affidavit does assert that Crowe is “personally responsible for payment of the loan without condition to whether the security interest on the collateral is released” (1i 19). The contract provides that ESL’s predecessor in interest’s “failure to file a security interest, . . . release of a security interest or granting extensions of time of payment shall not affect my obligation under this Contract and/or Security Agreement.” This language is clear enough to withstand scrutiny under Executive Bank of Fort Lauderdale, Fla. v Tighe (54 NY2d at 336-339). In the circumstances, the waiver or consent issue must be addressed.
A waiver of the impairment of collateral defense is permitted by the common law and UCC 3-606 but was not intended to apply to the postdefault context. In this case, ESL concedes that Bovee defaulted and that it repossessed the truck (with Crowe’s assistance) in Florida. The debtor’s article 9 rights are triggered *261 by the creditor’s possession of the collateral after a default. (UCC 9-601, 9-610; Coxall v Clover Commercial Corp., 4 Misc 3d 654, 658 [Civ Ct, Bangs County 2004, Battaglia, J.] [once creditor takes possession of the collateral, “it was obligated to deal with the vehicle in accordance with the requirements of article 9”]; 96 NY Jur 2d, Secured Transactions § 307; see also, Transamerica Commercial Fin. Corp. v Rochford, 244 Neb 802, 807, 509 NW2d 214, 218 [1993] [“nothing in the record to indicate that the collateral . . . has been repossessed,” hence no “disposition” of collateral by mere assignment]; Leighton v Fleet Bank of Me., 634 A2d 453, 456 [Me 1993] [“In order for any of the rules regarding the disposition of collateral to come into effect, . . . the creditor must actually take possession of the collateral”]; Connecticut Natl. Bank v Douglas, 221 Conn 530, 539, 606 A2d 684, 688 [1992] [“In the absence of either actual or constructive possession by the bank, Nelson cannot prevail on his claim that the bank violated his rights under part 5 of article 9 of the Uniform Commercial Code”]; First City Bank-Farmers Branch, Tex. v Guex, 677 SW2d 25, 28 [Tex 1984] [“disposition occurred” when secured party “took possession of the boat”; “(h) ad the legislature intended the meaning urged by the bank, they would have omitted ‘or otherwise dispose’ after ‘sell’ and ‘lease’ ”]; Robert L. Haig, Commercial Litigation in New York State Courts § 67:82, at 502 [4A West’s NY Prac Series 2005] [“Where the holder or payee is in possession of the collateral or has proceeded to enforce its rights against the collateral, the issue of impairment will be governed by revised UCC Article 9”].) ESL, recognizing that it had entered the domain of article 9 and in accordance with UCC 9-611, gave Crowe notice of its intended sale of the truck. If she was incorrect in her then stated position that she was not liable on the contract, she had every reason to believe that ESL would dispose of the truck in a commercially reasonable manner, UCC 9-610 (former 9-504), and that her exposure would, thereby, be reduced.
Her waiver of suretyship defenses in the purchase money installment sales contract cannot extend to the postdefault context. (UCC 9-602.) In New York, the cases hold that a surety or
“guarantor is a ‘debtor’ within the definition set forth in Uniform Commercial Code § 9-105 (1) (d) [now § 9-102 (a) (28) (debtor); § 9-102 (a) (71) (secondary obligor)], and, therefore, a guarantor may not waive the defense of commercial reasonable *262 ness, pursuant to Uniform Commercial Code § 9-501 (3) [now §§ 9-601, 9-610].” (Marine Midland Bank, N.A. v Kristin Intl., 141 AD2d 259, 261 [4th Dept 1988].)
In so holding, the court relied on Ford Motor Credit Co. v Lototsky (549 F Supp 996 [ED Pa 1982]), in which it was stated that it was not “anomalous that a surety under section [3-606] of the Code can consent to impairment of collateral while upon default a surety is precluded from waiving the defense of commercial reasonableness in the disposition of collateral” because section 3-606 “is applicable only to the pre-default stage, while § 9-504 [now §§ 9-601, 9-602, 9-610] specifically governs the disposition of any collateral remaining to secure the debt.” (Id. at 1005 n 34; see also, Weinstein v Fleet Factors Corp., 210 AD2d 74 [1st Dept 1994]; Marine Midland Bank v CMR Indus., 159 AD2d 94, 104-107 [2d Dept 1990]; Bank of China v Chan, 937 F2d 780, 785-786 [2d Cir 1991] [canvassing the New York authorities on the subject].) Accordingly, the nonwaiver rule of UCC 9-602 (g) (disposition of collateral) applies to this post-default-repossession context. (See UCC 9-602, Comment 2 [“in the context of rights and duties after default, our legal system traditionally has looked with suspicion on agreements that limit the debtor’s rights and free the secured party of his duties . . . The context of default offers great opportunity for overreaching”]; AAR Aircraft & Engine Group, Inc. v Edwards, 272 F3d 468, 472-473 [7th Cir 2001] [nonwaiver rule “prevents economic waste and unjust enrichment because creditors who believe that they have obtained a waiver have no incentive to behave in a commercially reasonable manner”].)[3]
*263 The question then is whether ESL’s disposition of the truck was commercially reasonable under section 9-610.[4] Under section 9-609 (a) (1) (former § 9-503), the secured party “may take possession of the collateral,” as indeed ESL did here, and then, under section 9-610 (a) (former § 9-504), “may sell, lease, license, or otherwise dispose of any or all of the collateral.” However, “[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.” (UCC 9-610 [b].) Except in the context of waivers obtained from a debtor after default under section 9-624, “to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor may not waive or vary the rules stated . . .” (UCC 9-602) with respect to the disposition of collateral or the redemption of collateral. (UCC 9-602 [g], [k].) In this case, ESL decided that it would grant the obligor, Bovee, possession upon his redemption of the vehicle, as section 9-623 (former § 9-506) requires. Such action, which occurred “after default” (§ 9-610 [a]) and repossession (§ 9-609 [a] [1]), is a “disposition of collateral” under section 9-610. But it was not, in “[e]very aspect . . . including the method, manner, . . . and other terms, . . . commercially reasonable.” (UCC 9-610 [b].) The assumption under section 9-623 is that “[i]f unmatured secured obligations remain, the security interest continues to secure them.” {Id., Comment 2.) That did not happen here. Instead, ESL released its security interest, notified DMV of the same (as well as Crowe when she ultimately inquired), and thereby permitted the redeemer to promptly enrich himself by selling the unencumbered vehicle out of state and, thereafter, default on the loan. As in the predefault context with no waivers or consent in place, such conduct by the secured party is entirely unreasonable; it is “active rather than passive negligence.” (Executive Bank of Fort Lauderdale, Fla. v Tighe, 66 AD2d at 75; see Leslie Fay, Inc. v Rich, 478 F Supp 1109, 1116 [SD NY 1979] [“guarantor may assume great risks, but (s)he should be entitled to expect creditors to behave with at least a minimal degree of commercial reasonableness and care *264 . . . (with respect to an accommodation party;) it seems reasonable for that party to rely on the expectation that a businessman-creditor will act responsibly and make at least a reasonable effort to secure its collateral under the UCC, thereby protecting the guarantor’s subrogation interest”], quoted in Port Distrib. Corp. v Pflaumer, 880 F Supp at 210.) Accordingly, Crowe has raised an issue of fact on her eighth affirmative defense.
This is enough to dispose of plaintiffs motion for summary judgment. But in view of Crowe’s cross motion to amend the answer to add a counterclaim, the question of the extent of remedy should be addressed, if only to avoid a waste of judicial resources. The loss under section 3-606 (1) (b) is the extent of the value of the security released or impaired (Mikanis Trading Corp. v Block, 59 AD2d 689, 690 [1st Dept 1977]), and the surety has the burden of proof. In the case of release of security, when the circumstances are such that valuation of a lost security is impossible or speculative, there is one recent case which holds that the pro tanto discharge is 100%. (Port Distrib. Corp. v Pflaumer, 880 F Supp 204, 208-210 [SD NY 1995] [holding that, under New York law, a “creditor who releases (rather than merely impairs) collateral without the consent of the guarantor discharges the guarantor from his or her obligations under the guarantee”; secured party’s “actions resulted in more than a mere impairment of collateral” because it “released the collateral entirely”], affd 70 F3d 8 [2d Cir 1995] [per curiam]; see Langeveld v L.R.Z.H. Corp., 74 NJ 45, 56-57, 376 A2d 931, 937 [1977] [“there are factual situations!,) this may or may not be one of them(,) where a surety may be able to establish that he has sustained prejudice, but be unable to measure the extent of the prejudice in terms of monetary loss. Where such a situation is presented the surety will normally be completely discharged”], quoted in In re Alcock, 50 F3d 1456, 1462-1463 [9th Cir 1995] [holding the guarantor completely discharged on the facts]; cf., Bank of N.J. v Pulini, 194 NJ Super at 168, 476 A2d at 800 [remanding for a determination whether the released vehicle can be valued “as of the date of plaintiffs initial demand against defendant”]; Donald J. Rapson, Symposium: The Restatement of Suretyship: History and Background of the Restatement of Suretyship, 34 Wm & Mary L Rev 989, 1009-1011 [1993].)
The law is more complicated in this article 9 context, particularly because this is a consumer transaction. Generally, under section 9-625 (b), damages for noncompliance with the requirement that the disposition of collateral occur in a com *265 mercially reasonable manner shall be “in the amount of any loss caused by a failure to comply with this article.” That loss, in an abstract sense, is measured by the loss Crowe would suffer by reason of not having the collateral available for assignment to her when she may be subrogated to ESL’s claim on the collateral upon payment of the loan. In this department, the rule has been, generally under article 9, that “there is a presumption that the security was equal to the debt and that the secured party has the burden of proof to overcome such presumption.” (Security Trust Co. of Rochester v Thomas, 59 AD2d 242, 246 [4th Dept 1977, Witmer, J.]; see also, Matter of Excello Press, Inc., 890 F2d 896, 900-901, 902, 903-904 [7th Cir 1989] [comprehensive discussion of New York authorities]; In re Stedman, 264 BR 298, 301-303 [WD NY 2001] [discussing the contrasting Appellate Division decisions on the subject]; Coxall v Clover Commercial Corp., 4 Misc 3d 654, 664 [Civ Ct, Kings County 2004] [same].) As the court’s comprehensive opinion in Coxall points out, although revised article 9 settled law in this area in accord with the Fourth Department’s approach, which is commonly called the “rebuttable presumption” approach, it did so only for nonconsumer transactions. (Id.; UCC 9-626 [a] [3] [B].) This was, unquestionably, a consumer transaction, and therefore the code provides that it “intended to leave to the court the determination of the proper rules in consumer transactions . . . [including that the court] may continue to apply established approaches.” (UCC 9-626 [b].) In Coxall, the court observed that “New York courts have not distinguished between consumer and nonconsumer transactions in fashioning rules” in this area. (Coxall, 4 Misc 3d at 665.) Presumably, a court faced with this broad grant of discretion would wish to consider what other remedies are available to the parties, including the debtor’s remedies under UCC 9-625 (c) (2) providing for statutory damages “in any event an amount not less than the credit service charge plus 10 percent of the principal amount of the obligation or the time-price differential plus 10 percent of the cash price.” This remedy is available for “every noncompliance with the requirements of Part 6 in a consumer-goods transaction . . . regardless of any injury that may have resulted” (UCC 9-625, Comment 4), and even though the “deficiency is eliminated or reduced under Section 9-626,” either pursuant to the rebuttable presumption rule of that section, or one under the existing “traditional approaches” allowed for consumer transactions. (UCC 9-625 [d].)
*266 There is, to be sure, no guidance on the issue from the Court of Appeals. The available cases from other New York courts on the subject generally do not distinguish between consumer and nonconsumer contexts, as Judge Battaglia in Coxall has demonstrated. Presumably, the struggle New York courts have had with this issue (compare, Central Budget Corp. v Garrett, 48 AD2d 825 [2d Dept 1975] [failure to prove commercial reasonableness bars deficiency], with Security Trust Co. of Rochester v Thomas, supra [such failure creates presumption that the security was equal to the deficiency and placing the burden on the secured party]) predicts an impending struggle to find the correct rule to be applied in the consumer context. In the context of inadequate notice of the sale, one court canvassing New York authority observed that “the absolute bar rule has the virtue of predictability, [but] it produces a penalty out of line with the gravity of the omission.” (Matter of Excello Press, Inc., 890 F2d at 904.) In this case, however, the failure to preserve the collateral upon the obligor’s redemption, indeed its outright release, is a much graver act of commercial unreasonableness vis-á-vis the accommodation maker’s interests.
Perhaps that is why, in Pflaumer, the court held that, upon release (instead of mere impairment), the pro tanto reduction is 100%. Before Revised UCC 9-626 (a) (3) settled on the rebuttable presumption rule for nonconsumer cases in New York, the cases within New York did not appear as categorical as the court in Pflaumer would have them, at least by this court’s reading. The ultimate issue need not be reached in order to adequately dispose of plaintiffs motion. Although a court may search the record “with respect to a cause of action or issue that is the subject of the motions before the court” (Dunham v Hilco Constr. Co., 89 NY2d 425, 430 [1996]), the issues just raised are not, strictly speaking, the subject of the motion and cross motion before the court as presently framed. Plaintiff thought it had summary judgment on a sum certain and so moved. Defendant thought it could avoid the contract on a number of unmeritorious grounds, directed at the car dealership and plaintiff in an amended answer. Neither understood the true issues upon which the case must be resolved. Accordingly, it is enough now simply to deny plaintiffs motion.
If ESL will not stipulate to discontinuance, leave is granted Crowe to file a motion to amend her answer to add a counterclaim for damages under UCC 9-625.
*267 Conclusion
Plaintiffs motion for summary judgment is denied. Crowe’s cross motion for summary judgment dismissing the complaint on jurisdictional grounds is marked withdrawn. Crowe’s motion for leave to amend her answer to add counterclaims and cross claims, and to correct her sixth affirmative defense in some unspecified way, is denied also. The denial of the motion to amend is, for the reasons stated above, without prejudice to the motion to amend described above.

. Under UCC 3-606 (1) (b): “The holder discharges any party to the instrument to the extent that without such party’s consent the holder ...(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.” Thus, under section 3-606 (1) (b), a discharge occurs when the holder, ESL, unjustifiably impairs collateral for the instrument given by a person (Bovee) against whom Crowe has a right of recourse without securing the consent of Crowe. It is not necessary under subdivision (1) (b) that ESL have knowledge of the right of recourse, but ESL has conceded, in oral argument if not otherwise, that Crowe has a right of recourse against Bovee in this circumstance. (Cf., Beneficial Fin. Co. of N.Y. v Husner, 82 Misc 2d 550, 551-552 [Sup Ct, Wayne County 1975, Boomer, J.]; see generally, Richard H. Nowka, The Nonsurety Comaker’s Right to Discharge Under U.C.C. Section 3-606: Code and Comment, 10 J L & Com 75 [1990]; 80 NY Jur 2d, Negotiable Instruments § 567.)

. Unquestionably, Crowe is “an accommodation co-maker” because she was “one who simply lends . . . her name to back up the performance of the principal debtor while the latter has some interest in the subject matter of the debt.” (Florio v Cross, 194 AD2d 136, 138-139 [3d Dept 1993].) As in Florio v Cross (supra), Crowe presents undisputed evidence that she had no interest in the truck.

. Even under Revised UCC 3-605 (f) (former § 3-605 [i]), not adopted in this state (Donnelly and Donnelly, 2001-2002 Survey of New York Law, Commercial Law is a Humanism, 53 Syr L Rev 277, 277-278 [2003]; McLaughlin and Cohen, New York and Revised UCC Articles 3 and 4, NYLJ, Mar. 12, 1998, at 3, col 1), which arguably expands creditor’s rights to obtain waivers or advance consents, “the accommodation party who signed such a waiver could argue, for example, that it was discharged under Article 9 as a ‘debtor’ who had been injured by the secured creditor’s failure to conduct a commercially reasonable] resale which constituted an ‘impairment of the collateral.’ ” (2 James J. White and Robert S. Summers, Uniform Commercial Code § 16-11, at 131, 130 n 27 [Practitioner’s 4th ed 1995]; see Robert L. Haig, Commercial Litigation in New York State Courts § 67:82, at 503 [4A West’s NY Prac Series 2005] [“if the holder or payee has failed to liquidate the collateral in a commercially reasonable manner, the defendant’s consent to the collateral’s impairment or waiver of its rights thereby, made at (any time) before the collateral’s liquidation, will not be enforceable”].)

. The standard is the same under the common law: “As to Bankers’ post-default actions, the touchstone of its obligations as a secured party was to dispose of the collateral in a ‘commercially reasonable’ manner.” (Bankers Trust Co. v Dowler & Co., 47 NY2d 128, 134, 134 n 4 [1979] [observing that “this broadly stated standard of conduct evolved long before our adoption of the Uniform Commercial Code in 1964”], citing Matter of Kiamie, 309 NY 325, 330 [1955] [which stated that, in the postdefault context, the secured party “must do nothing to impair the pledge’s value”].)